*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ROBERT ALEXANDER, M.D., Personal
Representative of the ESTATE OF MARY
ALEXANDER,

       Plaintiff-Appellant,

v

ALICE DOE, M.D., and BORGESS MEDICAL
CENTER, doing business as BORGESS
PULMONARY & SLEEP MEDICINE,

       Defendants-Appellees.

UNPUBLISHED
September 12, 2024

No. 364073
Kalamazoo Circuit Court
LC No. 2017-000159-NH

Before: SWARTZLE, P.J., and K. F. KELLY and YOUNG, JJ.

PER CURIAM.

In this case involving allegations of medical malpractice, plaintiff Robert Alexander, M.D., acting as the personal representative for the Estate of Mary Alexander,[1] appeals by right the judgment of no cause of action entered by the trial court in favor of defendants, Alice Doe, M.D., and Borgess Medical Center, after the jury returned a verdict finding that Dr. Doe was not professionally negligent. On appeal, the Estate argues that the trial court deprived it of a fair trial by excluding evidence that Dr. Doe had been disciplined; by allowing the autopsy report into evidence; by refusing to allow the Estate to call expert rebuttal witnesses, Dr. Raymond Edison, and Dr. William Katz; and by refusing to strike an expert who testified on behalf of the defense, Dr. Gary Ferenchick. The Estate also maintains that the verdict was contrary to the great weight of the evidence and that the jury made its decision on the basis of racial animus. Because we conclude that the Estate has not identified any errors that warrant a new trial, we affirm the jury's verdict.

---

[1] The decedent was Dr. Alexander's wife. For ease of reference, we refer to the decedent as Mary and to her husband as Dr. Alexander.

## I. BASIC FACTS

Dr. Doe began treating Mary in 2012 and continued to do so until Mary's death in September 2014. Testimony established that Mary had multiple health concerns when Dr. Doe began caring for her. Mary suffered from chronic and severe pain. She had pain in her shoulder, lower back, neck, hips, and knees. She had generalized osteoarthritis. She was also morbidly obese, had obstructive sleep apnea, had obesity hypoventilation syndrome, suffered from hypertension, had low thyroid function, had been depressed, had acid reflux, and was prediabetic. It was eventually determined that she was suffering from right-side heart failure.

In 2017, Dr. Alexander caused the Estate to sue Dr. Doe and Borgess as Dr. Doe's employer. The Estate alleged that Dr. Doe failed to properly care for Mary. More specifically, the Estate maintained that Dr. Doe overprescribed narcotics to treat Mary's pain and that the excessive narcotics caused Mary's premature death.

The case was tried before a jury in October 2022, and the jury found that Dr. Doe's treatment of Mary did not fall below the standard of care applicable to a doctor practicing internal medicine during the relevant time frame. The trial court entered a judgment of no cause of action on the basis of the jury's verdict. The Estate then appealed by right in this Court.

## II. THE CONSENT ORDER

## A. PRESERVATION

We first address the Estate's claim that the trial court erred when it refused to allow the Estate to present evidence that Dr. Doe had consented to entry of an order disciplining her over Mary's care after an investigation by the Department of Licensing and Regulatory Affairs (LARA).

Dr. Doe and Borgess argue in response that the Estate failed to properly preserve this claim of error. In civil cases, Michigan follows "the 'raise or waive' rule of appellate review." *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008). Under that rule, to preserve an issue for appellate review, the party asserting error must demonstrate that the issue was raised in the trial court. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). Moreover, the party asserting error must show that the same basis for the error claimed on appeal was brought to the trial court's attention. *Samuel D Begola Servs, Inc v Wild Bros*, 210 Mich App 636, 642; 534 NW2d 217 (1995). The failure to raise an issue in the trial court waives that issue for appellate review. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 359090); slip op at 3.

Dr. Doe and Borgess make much of the fact that the Estate improperly raised this issue in the trial court in its motion for judgment notwithstanding the verdict, which was filed only after the trial court no longer had jurisdiction to hear the motion. An evidentiary error is normally preserved by raising it during trial. See *Nahshal v Fremont Ins Co*, 324 Mich App 696, 709-710; 922 NW2d 662 (2018). There is no requirement that a claim of evidentiary error be raised in a motion for judgment notwithstanding the verdict or for a new trial. In this case, the parties raised the matter of the consent order before trial in a motion in limine and again at trial. This was adequate to preserve the claim of error on the grounds asserted in the trial court. See *id*.

## B. STANDARD OF REVIEW

This Court reviews a trial court's decision whether to admit evidence for an abuse of discretion. *Mitchell v Kalamazoo Anesthesiology, PC*, 321 Mich App 144, 153; 908 NW2d 319 (2017). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*. at 153-154. A trial court necessarily abuses its discretion when its decision is premised on an error of law. *Gay v Select Specialty Hosp*, 295 Mich App 284, 292; 813 NW2d 354 (2012). This Court reviews de novo whether the trial court properly applied the rules of evidence. *Mitchell*, 321 Mich App at 154.

## C. ANALYSIS

In the trial court, the Estate argued that the consent order was relevant to show that Dr. Doe gave up her practice in internal medicine and stopped prescribing narcotics as a result of the consent order involving the investigation into Mary's death. The Estate also felt it was admissible to challenge Dr. Doe's credibility. The Estate raised the same grounds at trial.

Relevant evidence is generally admissible. See MRE 402.[2] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. In order to prove its malpractice claim against Dr. Doe, the Estate had to present evidence concerning the standard of care applicable to Dr. Doe at that time and that Dr. Doe breached that standard. See *Estate of Horn v Swofford*, 334 Mich App 281, 288; 964 NW2d 904 (2020).

Dr. Doe agreed to a consent order and stipulation in April 2021. In the consent order, LARA determined that Dr. Doe violated MCL 333.16221(a) (stating that the violation of a general duty is a ground for disciplinary action), (b)(*i*) (stating that incompetence is a ground for disciplinary action), and (w) (stating at that time that a violation of MCL 333.7303a(4) or (5), which addresses a physician's duty to review the Michigan Automated Prescription System (MAPS) before making prescriptions after June 1, 2018, can constitute grounds for a disciplinary action). LARA reprimanded Dr. Doe and fined her $5,000 for the violation.

In the stipulations accompanying the consent order, Dr. Doe stipulated that she was not admitting the truth of the allegations in the complaint—she was only pleading no contest for the purposes of waiving her right to a defense and allowing the disciplinary subcommittee to enter an order. Dr. Doe stipulated that Mary's case was complex and that, under the standards of care applicable from 2012 through 2014, Dr. Doe realized in hindsight that she could have made "different treatment decisions to improve [Mary's] care." Dr. Doe further stipulated that she had ceased practicing internal medicine and prescribed fewer opioids in her sleep practice. LARA noted that Dr. Doe's MAPS "compliance" greatly improved after the period identified in the complaint and identified that Dr. Doe had completed two hours of continuing education on prescribing opioids with persons who had sleep disorders and sleep-disordered breathing. Finally,

---

[2] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). Except as otherwise noted, we cite the version of the rules in effect at the time of trial.

LARA stipulated that its expert had "clarified that there was insufficient evidence of a direct causal connection between her identified findings of [Dr. Doe's] deficiencies and Mary's death."

The consent order and stipulations did not establish the standard of care applicable to Dr. Doe in 2012 through 2014. There was no mention of specific standards of care that might apply to a complex patient with numerous comorbidities. The order mentioned general grounds for disciplinary action, such as the violation of a general duty or incompetence, but it did not identify a particular duty that applied. The order further mentioned Dr. Doe's compliance with the MAPS requirement stated under MCL 333.7303a(4) and (5), but those requirements were first enacted in 2017 and did not become effective until 2018. See 2017 PA 248 (amending MCL 333.7303a to include the MAPS provisions). Consequently, Dr. Doe could not have violated MCL 333.7303a(4) for failing to consult MAPS when she was caring for Mary.

Dr. Doe conceded that, in hindsight, she could have made better decisions regarding Mary's care, but she did not concede that she actually violated a particular standard of care, and she did not identify the decisions that could have been better made with hindsight. LARA also did not suspend Dr. Doe's authority to practice internal medicine; Dr. Doe merely noted that she had focused her practice on sleep medicine, which reduced her need to prescribe controlled substances, and she stated that she had taken a continuing education class on the prescription of opioids to patients with sleep disorders. Although these latter stipulations indirectly implicate the standard of care for prescribing opioids to a patient with a sleep disorder, the stipulations did not identify what the standard of care might have been in 2014 and did not establish that Dr. Doe had conceded that she breached the applicable standard of care. At most, it established that Dr. Doe recognized that—within the range of decisions encompassed by the standard of care—she could have made better decisions for Mary. Therefore, the trial court properly excluded the consent order because it was not admissible to establish the standard of care or to establish that Dr. Doe violated an applicable standard of care. See MRE 401; MRE 402. Further, even if the consent order were admissible under MRE 401, any probative value would, for the reasons stated in this opinion—the confusion, the nuance, the lack of actual admission of wrong-doing—be "substantially outweighed" by the likelihood of confusing the issues or misleading the jury.

Because LARA did not suspend or limit Dr. Doe's right to practice medicine in any way, the consent order was also not relevant to prove that it had done so. Additionally, Dr. Doe's stipulation that she changed the focus of her practice did not permit an inference that she changed her practice in order to avoid a more serious disciplinary action, or even that she changed the focus of her practice as a result of the events involving Mary's death. Indeed, the evidence established that Dr. Doe changed her practice in 2015, long before the complaint to LARA and this lawsuit initiated. The Estate failed to establish that the consent order was relevant within the meaning of MRE 401. Therefore, it was inadmissible. See MRE 402.

## III. GREAT WEIGHT OF THE EVIDENCE

We next address the Estate's argument that the jury's verdict was contrary to the great weight of the evidence. To preserve a challenge to the great weight of the evidence in a civil case, the party making the claim must move for a new trial premised on the great weight of the evidence in the trial court. *Hyde v Univ of Mich Bd of Regents*, 226 Mich App 511, 525; 575 NW2d 36 (1997). The failure to move for a new trial in the trial court waives the claim of error. See *Rickwalt*

*v Richfield Lakes Corp*, 246 Mich App 450, 464; 633 NW2d 418 (2001); see also *Tolas Oil & Gas Exploration Co*, ___ Mich App at ___; slip op at 2-4.

In this case, the Estate did not move for a new trial premised on the great weight of the evidence until the day after it appealed by right in this Court. In a civil case, the trial court does not have the authority to set aside or amend a judgment once a party has filed a claim of appeal by right or has been granted leave to appeal. See MCR 7.208(A); cf. MCR 7.208(B). Indeed, the filing of an appeal divests the trial court of jurisdiction even to consider a motion that seeks to set aside or amend a judgment. See *Cary Investments, LLC v Mount Pleasant*, 342 Mich App 304, 320-321; 994 NW2d 802 (2022). Accordingly, the Estate's improperly filed motion for a new trial premised on the great weight of the evidence did not preserve this claim of error for appellate review.

Although this Court has the discretion to review unpreserved claims of error, our Supreme Court has cautioned that we must do so only sparingly and only to prevent a miscarriage of justice. See *Napier v Jacobs*, 429 Mich 222, 233-234; 414 NW2d 862 (1987). Seeing no miscarriage of justice here, we decline to exercise our discretion to review this unpreserved error.

## IV. AUTOPSY REPORT

The Estate also argues that the trial court improperly admitted the medical examiner's autopsy report. On the last day of trial, the trial court stated that the parties appeared to have agreed to stipulate to the admission of each other's exhibits, which were in bound volumes. The Estate's lawyer interjected that she wanted some documents removed from the defense's binder. One document she asked to have removed was the autopsy report. She explained that, although they had both questioned witnesses extensively about the report, no one was brought "in for any of them," and she felt that it was no more admissible than the "police report." She then asserted that it was inadmissible hearsay. She clarified that she was primarily concerned about the autopsy photos. She stated that she was only putting in the summary of the autopsy report. Defense counsel queried how one could put in a summary of the autopsy report without giving the jury a copy of the autopsy itself. At that point, the Estate's lawyer relented and agreed to admit the autopsy report. Defense counsel then agreed to remove the investigative reports and the photos.

By agreeing to the admission of the autopsy into evidence, the Estate's lawyer waived this claim of error. See *People v Carter*, 462 Mich 206, 215-216; 612 NW2d 144 (2000). Consequently, we will not review the same.

## V. REBUTTAL TESTIMONY

### A. PRESERVATION

We next address the Estate's claim that the trial court abused its discretion when it refused to allow the Estate to present rebuttal testimony and evidence. The Estate maintains that it should have been allowed to admit in rebuttal a report prepared by Dr. Manju Beier, or should have been allowed to call an expert in pharmacology.

As stated, the failure to raise an issue in the trial court waives that issue for appellate review. See *Tolas Oil & Gas Exploration Co*, ___ Mich App at ___; slip op at 3. The party

seeking admission of particular evidence excluded at trial must also ordinarily make an offer of proof sufficient to allow a reviewing court to determine whether the trial court erred. See *Detroit v Detroit Plaza Ltd Partnership*, 273 Mich App 260, 291-292; 730 NW2d 523 (2006).

After the defense rested, the Estate's lawyer informed the trial court that she wanted to call rebuttal witnesses. She explained that Dr. Doe testified about Mary's sleep apnea and "what should have been done, what was done—what she had the apneas that she had, etc., and the interpretation of that." She felt that the Estate should be able to rebut Dr. Doe's testimony with either Dr. Edison or Mary's actual sleep doctor, Dr. Katz. Defense counsel opposed the request because Dr. Edison was never revealed to be a specialist in sleep medicine. The defense also asserted that there was already evidence presented concerning Mary's sleep apneas, and there were no allegations that "her sleep apnea was inappropriately treated"; defense counsel simply could not see "what he", referring to Dr. Katz, "would add and so I think he would be duplicative of testimony or evidence that has already been presented for the jury."

The Estate's lawyer responded that it was essential to her case to have rebuttal. She explained that there was evidence that Mary had two different kinds of sleep apnea—central and obstructive—yet Dr. Doe did not decrease Mary's opioids. She felt that a rebuttal witness should be allowed to testify "as to whether or not that is a thing." She asserted that the expert would say that whether this thing was from opioids or obesity, the standard of care required a reduction in the level of opioids, and a sleep specialist would be able to say that a doctor cannot prescribe at that level. She also felt that Dr. Doe contradicted her own expert when she said that Mary did not have central sleep apnea.

The trial court indicated that it sounded as though the Estate wanted to have a sleep expert testify more broadly about the "pros and cons . . . with regard to an individual who has sleep apnea and is on various prescription medications, opioids." The court acknowledged that there were studies being done during the relevant time frame that eventually showed that practitioners should consider a patient's sleep apnea when prescribing opioids, but that was not yet part of the standard of care. The court concluded that the proposed rebuttal testimony would not help the jury understand what a practitioner of internal medicine would have done differently at *that* time for a patient with sleep apnea. The court concluded that it would also be prejudicial to the defense to reopen the proofs on that issue when it was not central to the original theory of the case. The court explained that, "at some point we have to say the line has to be drawn, otherwise quite honestly, we could go into weeks, if not months long litigation over every minutia involved in this particular matter." The court stated that the jury had been focused on whether Dr. Doe overprescribed opioids and properly treated Mary's obesity, and interpreting the sleep studies would be going too far and would unnecessarily lengthen the trial.

The trial court thereafter allowed the Estate to recall its expert, Dr. Aaron Maddox, to offer rebuttal testimony. Dr. Maddox testified that practitioners of internal medicine took into consideration a patient's respiratory issues when prescribing opioids during the relevant time. He also testified that Mary had both central and obstructive sleep apnea, and he told the jury that Mary's medications were all too high given her comorbidities.

The record shows that the Estate adequately preserved its claim that it should have been allowed to call Dr. Edison or Dr. Katz to testify in rebuttal. See *Glasker-Davis*, 333 Mich App

at 227. It also made a proper offer of proof for their testimony—namely, that the Estate would like to elicit testimony about Mary's sleep apnea and whether a practitioner of internal medicine should have considered Mary's sleep apnea when prescribing opioids. See *Detroit*, 273 Mich App at 291-292. The Estate, however, did not at any point in its argument before the trial court mention Dr. Beier's report or request the opportunity to call an expert in pharmacology. Therefore, the claim that the trial court erred when it denied rebuttal using Dr. Beier's report or erred by refusing to allow the Estate to call a pharmacologist was not preserved for appellate review. See *Glasker-Davis*, 333 Mich App at 227. On this record, we treat the evidentiary claim of error involving the report by Dr. Beier and the request to call a pharmacologist as waived. We further decline to exercise our discretion to review those claims. See *Napier*, 429 Mich at 233.

## B. STANDARD OF REVIEW

A trial court has the discretion whether to allow rebuttal evidence. *Lopez v Gen Motors Corp*, 224 Mich App 618, 637; 569 NW2d 861 (1997).

## C. ANALYSIS

"Rebuttal testimony is used to contradict, explain, or refute evidence presented by the other party in order to weaken it or impeach it." *Lima Twp v Bateson*, 302 Mich App 483, 502; 838 NW2d 898 (2013) (quotation marks and citation omitted). In the trial court, the Estate indicated that it wanted to call Dr. Edison or Dr. Katz to rebut the testimony by Dr. Doe concerning Mary's sleep apnea. Although her argument was not entirely clear, it appeared that the Estate's lawyer wanted to present evidence that Mary had both central sleep apnea and obstructive sleep apnea. She also wanted to have a witness testify that Dr. Doe should have considered both types of sleep apnea when prescribing opioids to Mary. She may also have wanted to have testimony about the appropriate standard of care for a doctor practicing sleep medicine.

The parties presented evidence at trial that Mary had both types of sleep apnea, and the defense's witnesses specifically addressed whether the standard of care required Dr. Doe to consider Mary's comorbidities when prescribing opioids. The Estate's expert opined that the standard of care required Dr. Doe to prescribe less narcotics in light of Mary's respiratory issues (that is, her sleep apnea), and the defense experts and Dr. Doe indicated that Mary's pain-management regimen was appropriate even with her respiratory issues. As such, the issue was plainly presented in the parties' cases-in-chief. The Estate could have—and likely should have—presented further evidence about the role that sleep apnea played in the formulation of a safe pain-management regimen in its case-in-chief, but it chose not to do so. Accordingly, it was not rebuttal evidence. See *id.* (stating that, normally, a party may not introduce evidence competent as part of his case-in-chief as rebuttal evidence).

It was also undisputed that Dr. Doe treated Mary as an internal medicine practitioner, not as her sleep doctor. As such, the standard of care for a sleep doctor was irrelevant, see MRE 401, and inadmissible, see MRE 402. Such testimony would also be inappropriate because it involved a collateral matter. See *Westland v Okopski*, 208 Mich App 66, 72; 527 NW2d 780 (1994) ("When rebuttal evidence is permitted, it must relate to a substantive matter rather than a collateral one."). Similarly, whether to prescribe opioids at all, or whether to prescribe them in a lower dose, was a matter of the standard of care for a practitioner of internal medicine, and Dr. Edison had already

been precluded from offering testimony because he was not board-certified in internal medicine during the relevant time frame. There was also no indication in the record that Dr. Katz met the requirements to offer standard-of-care testimony for internal medicine. See MCL 600.2169(1). The question was not whether a practitioner of sleep medicine would have treated Mary's pain management differently.

The only issue that was arguably a matter of rebuttal involved Dr. Doe's claim that Mary's result showing that she had central sleep apnea might have been caused by Mary's use of a bilateral positive airway pressure machine. That testimony suggested that Mary did not in fact have central sleep apnea. Nevertheless, the defense's experts all agreed that Mary had signs of central sleep apnea and opined that Dr. Doe's prescriptions were proper notwithstanding that finding. As the trial court aptly noted in denying the request for rebuttal, presenting additional witnesses on sleep apnea would not have been particularly helpful to the jury and would have needlessly prolonged the trial. Given that the evidence would, in part, be cumulative and involved a collateral matter, it was well within the range of principled outcomes for the trial court to preclude the Estate from calling Dr. Edison or Dr. Katz to further educate the jury about the different types of sleep apnea. See *Mitchell*, 321 Mich App at 153-154.

Finally, the trial court actually allowed the Estate to recall Dr. Maddox to offer rebuttal testimony. He specifically stated that both types of sleep apnea increase the chances that a patient might die if prescribed opioids. He stated that Dr. Doe should have considered Mary's sleep apneas when prescribing her opioids. Although the trial court did not allow the Estate to call its preferred witnesses, it nevertheless allowed the Estate to present rebuttal testimony on the relevant points, and the jury rejected the claim that Dr. Doe breached the standard of care by failing to consider Mary's sleep apnea when prescribing narcotics for her pain management. Consequently, any error in the trial court's decision to deny the Estate's request to call Dr. Edison or Dr. Katz was harmless. See MCR 2.613(A).

## VI. STRIKE DEFENSE EXPERT

### A. PRESERVATION

The Estate also argues that the trial court erred when it allowed the defense to present Dr. Ferenchick as an expert witness. At trial, the Estate objected to the admission of Dr. Ferenchick as an expert solely on the ground that he "has never worked in private practice, like Doctor Doe." The Estate did not assert that he should be stricken or disallowed because his testimony would be cumulative to Dr. John Bonema's testimony. Therefore, the argument that the trial court abused its discretion when it allowed Dr. Ferenchick to offer cumulative testimony was not preserved. See *Samuel D Begola Servs*, 210 Mich App at 642. And we decline to exercise our discretion to review the claim of error to the extent that it is premised on cumulative testimony. See *Napier*, 429 Mich at 233. The Estate did preserve its claim to the extent that it now argues that the trial court should have disallowed Dr. Ferenchick's testimony on the ground that he was not in private practice. See *Glasker-Davis*, 333 Mich App at 227.

-8-

## B. STANDARD OF REVIEW

The trial court had the discretion to allow an expert to testify consistent with the requirements of the law. See *Gay*, 295 Mich App at 290.

## C. ANALYSIS

The Legislature has identified the relevant criteria that an expert in a medical malpractice case must meet, and engagement in private practice is not one of the criteria. See MCL 600.2169(1). The Legislature stated that the proposed expert need only devote a majority of his or her time to the active clinical practice or instruction of students in the same health profession. See MCL 600.2169(1)(b); *Gay*, 295 Mich App at 294-300 (explaining what constitutes active clinical practice and instruction sufficient to meet the statutory requirements).

Dr. Ferenchick testified that he worked for Michigan State University's college of human medicine. As an academic, his work was divided between patient care, direct teaching, research, and administrative service. He saw patients for 20% to 30% of his time when not working at the hospital. When rounding at the hospital, he saw patients 100% of the time. He stated that he spent 30% of his time teaching medical students. Dr. Ferenchick also testified that he worked from six to eight weeks out of every year as a hospitalist in the hospital. He later clarified that he had a panel of about 300 patients that he saw on a continuous basis.

Dr. Ferenchick clearly met the professional practice requirements stated under MCL 600.2169(1)(b). See also *Gay*, 295 Mich App at 294-300. Accordingly, the trial court did not abuse its discretion when it determined that Dr. Ferenchick met the statutory requirements and allowed him to testify on that basis. See *Mitchell*, 321 Mich App at 153-154.

## VII. BIASED JURY

Finally, the Estate asserts that this Court should order relief premised on its claim that the jury only reached its decision as a result of racial bias.

The Estate relies on an unsworn "declaration" apparently signed by Dr. Alexander as proof that the jury was racially biased against him. In the declaration, Dr. Alexander asserted that he received a message on his cell phone in which an unknown messenger allegedly wrote: " 'All the whitey' were against me from day 1." Dr. Alexander also wrote that the messenger stated: " 'Your lawyer was well prepared. Sorry brother!!!' " Dr. Alexander asserted that he tried to "retrieve the message" but was unable to "find it again."

Setting aside the obvious infirmities in this evidence of bias, the Estate raised this issue for the first time in its motion for a new trial, which, as already discussed, it submitted after it appealed in this Court and the trial court no longer had jurisdiction to consider it. Because the Estate did not timely raise this issue in the trial court, the trial court did not have any opportunity to address it and did not hold an evidentiary hearing to explore the issue of bias. Therefore, this claim of error is not preserved and waived. See *Tolas Oil & Gas Exploration Co*, ___ Mich App at ___; slip op at 3. Moreover, because the Estate failed to support its claim of bias with admissible evidence and meaningful legal argument, we decline to exercise our discretion to review it. See *Napier*, 429 Mich at 233.

-9-

## VIII.  CONCLUSION

The Estate failed to identify any errors that warrant relief.  Accordingly, we affirm.  As the prevailing parties, Dr. Doe and Borgess may tax their costs.  See MCR 7.219(A).

/s/ Brock A. Swartzle
/s/ Kirsten Frank Kelly
/s/ Adrienne N. Young